# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| TERRY BELL, individually and on behalf of all others similarly situated, | Case No.  1:25-CV-00004 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| SELECT PORTFOLIO SERVICING, INC., | |
| Defendant. | |

## INTRODUCTION

1.     Plaintiff Terry Bell ("Plaintiff"), on behalf of herself and all others similarly situated, alleges violations of the North Carolina Debt Collection Act ("NCDCA") and the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") against Defendant Select Portfolio Servicing, Inc. ("SPS").

2.     Defendant SPS is a large servicer of residential mortgages. SPS routinely violates North Carolina law and breaches the uniform terms of borrowers' mortgages ("Uniform Mortgages") by charging and collecting illegal processing fees when borrowers pay their monthly mortgage by phone ("Pay-to-Pay Fees"). SPS illegally charges homeowners fees up to $15 for each telephone payment.

3.     The NCUDTPA makes Pay-to-Pay Fees deceptive, unfair, and unlawful. Additionally, the NCDCA forbids SPS from collecting any part of its fee or charges for services rendered. And it further prohibits SPS from collecting incidental fees and charges

unless legally entitled. As Pay-to-Pay Fees are not expressly authorized in the borrowers' Uniform Mortgages nor permitted by any law, SPS violates the NCDCA by charging them.

4.      A substantial amount of SPS's Pay-to-Pay Fee is marked-up profit because it costs servicers like SPS $0.50 or less per transaction to accept payment over the phone. Here, SPS pockets the difference between the amount paid by borrowers and the actual expense it pays. This is an overcharge of up to $14.50 per transaction paid by Class Members.

5.      Despite its uniform contractual obligations to charge only fees explicitly allowed under the Uniform Mortgages and applicable law, SPS leverages its position of power over homeowners and demands exorbitant Pay-to-Pay Fees. Even if some fees were allowed, the mortgages' uniform covenants and applicable law only allow SPS to pass along the actual costs of fees incurred to it by the borrowers – here, only a few cents per transaction.

6.      Plaintiff paid these Pay-to-Pay Fees and brings this class action lawsuit individually and on behalf of all similarly situated putative Class Members.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction under 28 U.S. Code § 1332(d) because complete diversity exists between SPS and at least one member of the proposed Class and the matter in controversy exceeds $5,000,000. SPS services an estimated one million loans nationwide and collects Pay-to-Pay Fees from the Class alleged that are believed to be in an amount that exceeds $5 million.

8.      This Court has personal jurisdiction because SPS transacts business in North Carolina and commits torts in North Carolina, as described in this Complaint.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendant has caused harm to Class Members residing in this District, and Defendant is a resident of this District for the purposes of 28 U.S.C. 1391(c)(2) because it is subject to personal jurisdiction in this district.

## PARTIES

10.     The Plaintiff, Terry Bell, is a citizen and resident of the state of North Carolina.

11.     Ms. Bell has lived on the subject property for 19 years.

12.     Defendant Select Portfolio Servicing, Inc. is a Utah corporation with its principal place of business in Salt Lake City, Utah.

## FACTUAL BACKGROUND

I.      **APPLICABLE LAW**

A.      **North Carolina Debt Collection Act ("NCDCA")**

13.     The NCDCA offers broad protection to consumers from underhanded methods used by unscrupulous creditors and debt collectors. It applies broadly.

14.     The NCDCA defines "debt collector" as "any person engaging, directly or indirectly, in debt collection from a consumer. N.C. Gen. Stat. § 75-50(3).[1] It allows

---

[1] The statute does not apply to collection agencies, which are governed by the North Carolina Collection Agency Act ("NCCAA"), N.C. Gen. Stat. §§ 58-70-1 to -155. Based

recovery against both creditors collecting debts in their own names, and those whose primary business is debt collection via loan servicing.

15. A "consumer" under the NCDCA is "any natural person who incurred a debt or alleged debt for personal, family, household or agricultural purposes." N.C. Gen. Stat. § 75-50(1).

16. A "debt" under the NCDCA is "any obligation owed or due or alleged to be owed or due from a consumer." N.C. Gen. Stat. § 75-50(2).

17. The NCDCA prohibits "debt collectors" from "[c]ollecting or attempting to collect from the consumer all or any part of the debt collector's fee or charge for services rendered [or] any interest or other charge, fee or expense incidental to the principal debt unless legally entitled to such a fee or charge." N.C. Gen. Stat. § 75-55(2). Seeking to collect a debt that includes a Pay-to-Pay Fee violates this provision of the NCDCA.

### B. North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA")

18. The NCUDTPA broadly prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce. *See* N.C. Gen. Stat. § 75-1.1. Seeking to collect a debt that includes a Pay-to-Pay Fee violates this provision of the NCUDTPA.

### II. FACTUAL ALLEGATIONS

--------------------------------------------------

on information and belief, Defendant does not qualify as a "collection agency" under the NCCAA, as neither has purchased delinquent debt. Plaintiff reserves the right to amend the complaint to include claims under the NCCAA should discovery reveal that the Defendant does indeed function as a collection agency.

**A.    SPS is Retained by Mortgage Lenders to Service and Collect Mortgage Debt.**

19.    SPS is a loan servicer and sub-servicer that operates around the country. SPS buys mortgage servicing rights or contracts to sub-service mortgage servicing with a primary servicer and exercises those mortgage servicing rights to collect mortgage payments, charge authorized fees, enforce the mortgage or deed of trust and Note, and initiate foreclosure on properties that secure the mortgage or deed of trust and Note. SPS does not disclose the terms of its servicing agreements publicly.

20.    SPS enters into service agreements with lenders, primary servicers, note holders, and trustees, pursuant to which SPS provides servicing, sub-servicing and agency activities for loan portfolios. In accordance with those agreements, SPS is compensated by the lenders, note holders, and trustees to act as their agent and to exercise their rights and responsibilities pursuant to their approval.

21.    SPS either takes assignment of the servicing obligations in borrowers' loan agreements, and/or is in functional privity and near privity of contract with Plaintiff and Class Members, tasked with performing many of the obligations assumed by the lenders to Plaintiff's and Class Members' loan agreements.

**1.    Overview of the Mortgage Industry and Its Standardized Lending Practices**

22.    The residential mortgage lending industry is generally divided between two types of loans. The vast majority of loans are "conforming" loans that "conform" with particular uniform terms, conditions, and amounts under a certain threshold set by the Federal Housing Finance Agency in coordination with Federal National Mortgage

5

Association ("FNMA" or "Fannie Mae") and the Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac").

23.    FNMA and FHLMC are federally chartered corporations and are known as Government-Sponsored Enterprises ("GSEs"). In 2021, that funding threshold was $528,250 in many places, and up to $970,800 in higher cost-of-living areas. Loans that do not conform to these standards are typically "jumbo" loans and require more specialized underwriting due to the higher value of the property securing the mortgage.

24.    Conforming loans include both government loans (*i.e.*, those insured by the Federal Housing Administration, Veterans' Administration, or the U.S. Department of Agriculture), and conventional loans. Conforming loans must "conform" to the nationwide standards set by the GSEs, which purchase them to sell as pooled securities in the secondary market.

25.    To ensure ease of securitization, the GSEs create standard mortgage and deed of trust templates for all conventional loans, and the government agencies' templates are modeled after those GSE templates. While these templates contain sections for language that incorporates state requirements, this process too contains standardized language.

26.    Because the conforming lending process depends on standardization, all borrowers go through the same process to obtain a conforming loan. Mortgage lenders typically use industry software to generate the standardized templates and complete the templates with the borrowers' information. Once approved to borrow the funds, the borrowers execute these standard loan documents. Because the GSEs will accept for

6

securitization only those loans that adhere to their standard loan documents, a lender cannot add additional terms and there is no room for negotiation of any kind.

27.     After the mortgage or deed of trust agreement is finalized, the mortgage lender often sells the mortgage loan to the GSEs, who in turn bundle that mortgage loan with other conforming loans to sell as securities to investors in the form of mortgage-backed securities, which are bond-like securities that are secured by the homes.

28.     While the original mortgage lender may remain to service the securitized and pooled loan, the primary servicer or GSE often retains another servicer or sub-servicer (such as SPS) that specializes in the actual management and administration of mortgages to perform the servicing obligations required by the Uniform Mortgages.

### 2.     Mortgage Lenders and Note Holders Retain Mortgage Servicers Like SPS to Accept Payments and Collect Mortgage Debt from Borrowers.

29.     As part of the contractual or assignment process, the mortgage servicer or sub-servicer and the lender or GSE negotiate a fee schedule to compensate the mortgage servicer or sub-servicer for collecting payments and other servicing and collections work. The borrower has no role in this process.

30.     The fees paid to mortgage servicers or sub-servicers by the lender or GSEs come in a variety of forms. First, mortgage servicers or sub-servicers negotiate a servicing fee, which is typically a percentage of approximately 0.25-0.5% of a borrower's outstanding mortgage balance on an annual basis. The average balance on a mortgage loan in this country is $208,000. Thus, if a mortgage servicer agrees to perform work for .5% of the borrowers' balance, and a borrower has a $208,000 balance on the mortgage, the

7

servicer will receive $1,040 a year, or $86.67 a month to accept the payment from the borrower and apply it to the balance. The servicing agreement between the servicer or sub-servicer and lender or GSEs also includes other fee schedules negotiated between those contracting parties and may include things like allowing the holder of the mortgage loans to retain late fees (capped by the GSEs and set in the standardized loan templates) and the ability to retain interest on borrowers' escrow payments.

31.     Consumer borrowers have no say in who their designated loan servicers will be. Nor are they required to pay for loan servicing beyond paying their mortgage and agreed interest.

**B.     SPS is a Debt Collector that Charges Pay-to-Pay Fees to Increase its Profits.**

32.     SPS works in interstate commerce, collecting mortgage debt from borrowers nationwide from its headquarters in Utah. It is registered and licensed as a mortgage servicer, collection agency, debt collector, or similar in states around the country. It is retained by GSEs, note holders, and lenders to collect on mortgage debt pursuant to the terms of the Uniform Mortgages, which require monthly payments (payable on the first of every month). Thus, it is engaged in the regular collection of debt from residential mortgage borrowers.

33.     Each time a mortgage borrower whose loan is serviced by SPS makes a loan payment over the phone ("Pay-to-Pay Transaction"), SPS charges the borrower a Pay-to-Pay Fee of up to $15 for using this payment method.

34.     The cost for SPS to process a Pay-to-Pay Transaction is well below the amount charged to borrowers, and SPS illegally pockets the difference as profit.

35. The uniform contractual obligations in the mortgages SPS services do not authorize SPS to assess Pay-to-Pay Fees. At most, the Uniform Mortgages allow SPS to pass along only the actual cost of fees incurred by it to the borrower.

36. SPS violates its borrowers' Uniform Mortgages when it assesses such fees. SPS frequently, intentionally, and persistently collects Pay-to-Pay Fees even though such fees are not authorized by the mortgages, and it therefore had no right to collect them.

37. Uniform Mortgages require the monthly payment of mortgages by check or other electronic payment methods. Payments by check can cost loan servicers like SPS anywhere between $1 and $2 a month in processing and other fees, according to a 2022 report by the Association for Financial Professionals. Every check needs to be opened, reviewed, keyed into the computer system to apply to the loan, and deposited. Delays in postal operations and the high risk of human error generate customer service calls and require internal checkpoints and increased oversight. Borrowers who are concerned about the timeliness of the payment may call to ensure it was received and properly credited, adding to the customer service work associated with this routine part of servicing.

38. Because it is so expensive to process check transactions, every mortgage servicer in the country offers borrowers the option of having their monthly payment automatically debited via the ACH system. While offered under the auspice of improving services for borrowers, the cost of an ACH transaction is typically only few cents, and its electronic nature reduces overhead costs enormously.

39. Still, for many borrowers, the automatic ACH system is impractical as it requires a borrower to agree to a fixed amount and date for the debit each month out of a

pre-determined bank account and increases a borrower's vulnerability to banking errors. Borrowers may have budgetary needs or personal preferences that cause them to want more control over their finances. Some may wish to choose their payment method on a monthly basis. Others may be sharing responsibility for paying the mortgage with another person, and funds to pay it come from multiple bank accounts.

40. To reduce the expenses arising from borrowers who pay as required but prefer more control than the automatic ACH option allows for, many servicers offer borrowers the option to pay by phone or online. This option typically costs servicers less than 50 cents a transaction, far less than the cost of paying by check, and like the automatic ACH method, results in increased electronic efficiencies.

41. Because the cost savings is so significant, most mortgage servicing companies, as well as third-party debt collectors, allow consumers to make their mortgage payments over the phone or online, and many loan servicers offer these services for free. While phone and online payment methods are marketed as convenient for consumers, they are more cost-effective for the servicers over accepting paper checks. Thus, mortgage servicers find their profits increase substantially by simply increasing choices to customers.

42. Each time a borrower whose loan is serviced by SPS makes a payment over the phone or online, SPS charges the borrower a Pay-to-Pay Fee of up to $15.00.

43. These Pay-to-Pay Fees are materially higher than the costs incurred by SPS, can add up to hundreds of dollars over the life of a single loan, and provide millions of dollars in profits for SPS. Typically, a loan servicer will use a vendor to process transactions; these third-party vendors, such as Western Union and ACI Worldwide, charge

10

other loan servicers $0.50 or less per internet or phone transaction. The above-referenced 2022 Association for Financial Professionals report observes that the median cost for processing these transactions was between 26 and 50 cents, much less than its estimated check processing costs of $1 to $2. SPS does not use any vendor or third party to process the transactions, but rather does so in-house, and thus, its costs are likely far lower than the median.

44.     SPS's imposition of Pay-to-Pay Fees also amounts to double-charging. Thus, to build on the example above (¶ 30) where SPS hypothetically negotiated a 0.5% servicing fee, SPS agreed to receive that rate regardless of how the borrower elects to pay, knowing that it was obligated to accept payments via check from every borrower. Thus, out of the $86.67 it receives each month out of the loan payment being made by the borrower, it could incur as much as $4 in costs to process check payments, leaving $82.67 to cover other overhead costs and for its profit. SPS double charges borrowers by charging additional Pay-to-Pay Fees, up to $15 for each phone or online payment, over and above SPS's negotiated servicing fees agreed with the lender, GSE, or primary servicer.

45.     SPS purports to be providing a valuable service to borrowers to which they would not otherwise be entitled. But many mortgage loan servicers offer online and phone payments for free because of the cost savings to them when borrowers pay via these methods as opposed to by paper check. Thus, providing the service is not contingent on being able to charge for the service. Further, borrowers already pay SPS to service their loans by paying their mortgages. If SPS wants to make more money, it can negotiate a

11

larger fee from the lender, primary servicer, or GSE. It should not be permitted to double dip – pocketing the servicing cut, while up-charging borrowers for the same.

46.　　The Pay-to-Pay Fees materially exceed the costs incurred by SPS to process the phone and online payments, providing millions of dollars in unlawful profits for SPS.

47.　　SPS can charge these illegal Pay-to-Pay Fees because borrowers cannot choose another mortgage servicer or shop around for a better deal. Borrowers are forced to use SPS as their loan servicer.

**C.　　SPS's Pay-to-Pay Fees are Oppressive, Substantially Injurious to Consumers, and Violate Public Policy.**

48.　　As discussed herein, Pay-to-Pay Fees have earned condemnation from borrowers, federal and state legislatures, regulators, and attorneys general. Because of this, SPS is one of a dwindling minority of mortgage servicers still charging these fees.

49.　　The federal government and state governments have issued statements condemning Pay-to-Pay Fees and prohibiting loan servicers and debt collectors from assessing them.

50.　　In October 2022, President Biden announced that his administration would be taking steps to go after unfair "junk fees" such as Pay-to-Pay Fees. Around that time, the FTC announced that it was seeking comments on "junk fees," the "unnecessary, unavoidable, or surprise charges that inflate costs while adding little to no value." https://www.ftc.gov/news-events/news/press-releases/2022/10/federal-trade-commission-explores-rule-cracking-down-junk-fees (last accessed Dec. 17, 2024).

51.     Among the junk fees on which the FTC sought commentary were those imposed on "captive consumers," such as those who are dealing with a company that has "exclusive rights." *Id.* Chair Lina M. Khan explained that:

> No one has ever felt that a 'convenience fee' was convenient. Companies should compete to provide the best quality at the best price, not to see who can squeeze the most added expenses out of consumers. That's especially true at a time when families are struggling with the effects of inflation.

*Id.*

52.     The CFPB has been taking steps to address junk fees like Pay-to-Pay Fees. In June 2022, it issued an advisory opinion in which it "affirm[ed]" its position that imposition of "pay-to-pay or 'convenience' fees, such as fees imposed for making a payment online or by phone," where those fees are not contractually or legally authorized, is an "unfair or unconscionable means to collect or attempt to collect any debt" prohibited by Section 808(1) of the FDCPA and the CFPB's regulations implementing that provision. https://files.consumerfinance.gov/f/documents/cfpb_convenience-fees_advisory-opinion_2022-06.pdf (last accessed Dec. 17, 2024).

53.     This advisory opinion comes on the heels of other efforts by the CFPB to respond to the problems caused by Pay-to-Pay Fees. In October 2021, the CFPB, filed an *amicus* brief in a matter before the Ninth Circuit agreeing that the FDCPA prohibits the charging of any amount not expressly authorized by the agreement creating the debt or otherwise affirmatively permitted by state law. The CFPB explained:

> The FDCPA was designed to rein in unethical debt collectors, and Section 1692f(1) specifically was designed to limit the amounts that debt collectors could try to collect from consumers. But under the district court's interpretation, debt collectors can collect additional fees, like the pay-to-pay

13

fees at issue here, whenever no other law specifically prohibits them—leaving debt collectors with the power and discretion to try to collect additional fees during the collection process. This is particularly problematic given that consumers have no ability to shop around for a better deal. And it's not as if these pay-to-pay fees are necessary for debt collectors to offer phone or online payment options that consumers might want, as it is generally cheaper for collectors to accept payment by phone or online than to accept payment by mail (which is typically the fee-free option). Pay-to-pay fees are thus most often just a way for debt collectors to take advantage of consumers by trying to extract more money than they originally bargained for or reasonably expected to pay.

*Thomas-Lawson v. Carrington Mort. Servs.*, 9th Cir. No. 21-55459, Dkt. 22 (Brief of Amicus Curiae Consumer Financial Protection Bureau in Support of Plaintiffs-Appellants) at 11.

54.     The CFPB 's position on Pay-to-Pay Fees is not new. In 2017, the CFPB put out a bulletin on "Phone Pay Fees," in which it warned financial services providers and debt collectors about the many ways in which their fees for making payments over the phone could violate laws. In the bulletin, the CFPB expressly warned mortgage servicers that this practice might violate the FDCPA, stating:

Supervision has found that one or more mortgage servicers that met the definition of "debt collector" under the FDCPA violated the Act when they charged fees for taking mortgage payments over the phone to borrowers whose mortgage instruments did not expressly authorize collecting such fees and who reside in states where applicable law does not expressly permit collecting such fees. Supervision directed one or more servicers to review mortgage notes and applicable state law, and to only collect pay-by-phone fees where expressly authorized by contract or state law.

https://files.consumerfinance.gov/f/documents/201707_cfpb_compliance-bulletin-phone-pay-fee.pdf (the "CFPB 2017 Bulletin") (last accessed Dec. 17, 2024).

55. State regulators have also acted. In April 2022, in response to the CFPB's request for information on this issue, the Attorney General of the District of Columbia joined a coalition of 22 state attorneys general to call on the CFPB to prohibit mortgage servicers from charging Pay-to-Pay Fees. https://ncdoj.gov/wp-content/uploads /2022/04/State-Attorneys-General-Multistate-Comment-Letter-to-CFPB_convenience-fees_4.11.22_final.pdf (last accessed Dec. 17, 2024).

56. The group submitted comments solely on Pay-to-Pay Fees charged by mortgage servicers. The State AGs noted that Pay-to-Pay Fees are particularly problematic, explaining, "And since mortgage borrowers are a captive market for their particular servicer, borrowers can't simply avoid the fees by taking their business elsewhere." *Id.* at 2.

57. Similarly, in 2021, a coalition of 33 state attorneys general, including those representing California, Maryland, and New York, intervened to object to a settlement with another large mortgage servicer, when the terms of that agreement purported to permit the servicer to force borrowers to modify their Uniform Mortgages to allow it to assess Pay-to-Pay Fees. The New York Attorney General, speaking for the coalition, condemned the fees as unlawful:

> When Americans utilize online or phone payments to pay off their monthly mortgages, [mortgage servicer] PHH benefits, but instead of passing those savings on to homeowners PHH charged illegal fees and increased costs for nearly one million Americans," said Attorney General James. "PHH's sole purpose is to collect and process homeowners' payments, which it already makes millions of dollars from each year. In the 21st century, when most Americans pay their bills online or by phone, to charge fees on top of what they are already being paid is not only unethical, but unlawful. . . .

15

For years, PHH charged nearly one million homeowners an illegal fee — ranging from $7.50 to $17.50 — each time a homeowner made a monthly mortgage payment online or by phone, despite most Americans paying their mortgages one of these two ways. Nowhere in these homeowners' mortgage contracts is there authorization for such fees and PHH does not charge "processing" fees for any other customers, including those who pay by check or those who set up automatic debit payments. Charging fees not mentioned in the mortgage contract is illegal and, under New York's mortgage servicing regulations, explicitly forbidden.

Source:    https://ag.ny.gov/press-release/2021/attorney-general-james-leads-bipartisan-coalition-fighting-protect-nearly-one (Jan. 29, 2021) (last accessed Dec. 17, 2024).

### D.    Plaintiff's Allegations

58.    Plaintiff owns property in North Carolina that is secured by a mortgage and two Deeds of Trust. *See* Exhibits A, B. Plaintiff's mortgage loan is secured by property she owns for personal, family, or household uses.

59.    SPS is the servicer for Plaintiff's first and second mortgages:

- First Mortgage: Loan Account no. xxxxxx8351

- Second Mortgage: Loan Account no. xxxxxx7198.

60.    From as early as July 15, 2011, through as recently as February 16, 2022, Plaintiff paid each mortgage separately over the telephone and was charged a $15 Pay-to-Pay Fee by SPS for each payment.

61.    Burdened by the recurring $15 Pay-to-Pay Fees imposed by SPS for telephone payments, Plaintiff sought a more affordable alternative and was ultimately compelled to make mortgage payments through Walmart's Western Union service. This

alternative, while still incurring a fee, allowed Plaintiff to make payments at a reduced cost of $3 per transaction.

62.     The Deeds of Trust do not authorize Pay-to-Pay Fees. Rather, they each state that the "Lender may not charge fees that are expressly prohibited by this Security Agreement or by Applicable Law." Ex. A ¶ 14; Ex. B ¶ 13. The Deeds of Trust define Applicable Law as "all controlling applicable federal, state, and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions." Ex. A at 2 ¶ J, Ex. B at 2 ¶ J.

63.     SPS's collection of the Pay-to-Pay Fees violated the NCDCA and NCUDTPA because the Deeds of Trust do not expressly allow SPS to charge Pay-to-Pay Fees, and SPS's collection was an attempt to charge Plaintiff for SPS's services and costs. Nevertheless, SPS collected these fees as though they were allowed, failing to disclose that the fees were not authorized. SPS also failed to disclose that these fees were not the actual costs of the transactions incurred by SPS. The collection of these fees was an unfair and deceptive trade practice. SPS acted unfairly, illegally, and deceitfully by assessing Plaintiff more in Pay-to-Pay Fees than it actually disbursed to process Pay-to-Pay Transactions.

**E.     SPS Has Been Repeatedly Informed of the Wrongful and Illegal Nature of its Pay-to-Pay Fees.**

64.     SPS has been duly and adequately notified and informed that it is in violation of state and federal law.

65.     On November 8, 2024, prior to filing this Complaint, Ms. Bell made a written pre-suit demand upon SPS on behalf of similarly situated borrowers, mailing it by first

17

class mail. Specifically, Ms. Bell informed SPS that the Pay-to-Pay Fees are unlawful. A copy of that notice is attached hereto as Exhibit C.

66.     SPS was given a reasonable opportunity to cure the breaches complained of herein but has failed to do so. Despite receiving this notice, SPS has refused to remedy its violations as to Class Members. Further notice would be futile.

67.     In addition to the pre-suit notice provided by Plaintiff, SPS has long been aware that its assessment of Pay-to-Pay Fees is illegal but has refused to make modifications.

68.     SPS was aware of state and federal regulators statements and positions on Pay-to-Pay Fees. Indeed, as a mortgage servicer, SPS would have received and read the CFPB 2017 Bulletin referenced in Paragraph 54 and been on notice that its Pay-to-Pay Fees were illegal and violated federal debt collection law. SPS would also be aware of the various statements and actions by regulators described in Section IV.B.3.

69.     Furthermore, SPS is currently facing multiple lawsuits regarding this practice, and these cases are still pending.

70.     Therefore, when the Plaintiff provided notice to SPS in November 2024, SPS had already been informed that its practice of charging Pay-to-Pay Fees violated state and federal laws, public policy, and various legal duties and obligations. In addition to the Plaintiff's notice, SPS had ample information available through its role as a loan servicer to understand the full extent of the illegality of these fee practices. Despite this, SPS chose not to take corrective action.

71.     Indeed, SPS still charges the Pay-to-Pay Fees and has declined its opportunity to cure the imposition of those fees.

72.     Given SPS's multi-year refusal to cure, pre-suit notice from Plaintiff or any absent Class Member would have been futile and would stand as an unreasonable barrier to the enforcement of their contractual and statutory rights.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this action under Fed. R. Civ. P. 23 on behalf of the following Class of persons, subject to modification after discovery and case development:

> All persons (1) with a residential mortgage loan securing a property in North Carolina, (2) serviced or subserviced by SPS, (3) and who paid a Pay-to-Pay Fee to SPS when making a payment on their mortgage by telephone, internet, or an Interactive Voice Response system ("IVR") during the applicable statute of limitations period through the date a Class is certified.

74.     Class Members are identifiable through Defendant's records and payment databases.

75.     Excluded from the Class are the Defendant; any entities in which it has a controlling interest; its agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

76.     Plaintiff proposes that she be appointed as class representative.

77.     Plaintiff and Class Members have all been harmed by the actions of Defendant.

78.     Numerosity is satisfied. Upon information and belief, there are thousands of Class Members. Individual joinder of these persons is impracticable.

19

79. There are questions of law and fact common to Plaintiff and Class Members, including, but not limited to:

a. Whether SPS violated state law by charging Pay-to-Pay Fees not due;

b. Whether SPS violated state law by charging Pay-to-Pay Fees not due and unreasonable;

c. Whether SPS's costs of the Pay-to-Pay Transactions are less than the amount it charged for Pay-to-Pay Fees;

d. Whether Plaintiff and Class Members are entitled to injunctive relief;

e. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages as a result of Defendant's actions; and

f. Whether Plaintiff and the Class are entitled to attorney's fees and costs.

80. Plaintiff's claims are typical of the claims of Class Members. SPS charged Plaintiff Pay-to-Pay Fees in the same manner as the Class Members. Plaintiff and the Class Members entered into Uniform Mortgages in their Mortgage Agreements that prohibit Pay-to-Pay charges. Alternatively, if SPS is allowed under the Uniform Mortgages to charge Pay-to-Pay Fees, such amount is capped at the actual amounts disbursed by SPS to process the Pay-to-Pay Transactions.

81. Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class Members and she will fairly and adequately protect the interests of the Class. Plaintiff has taken actions before filing this Complaint, by hiring skilled and experienced counsel, and by making a pre-suit demand on behalf of Class Members to protect the interests of the Class.

82.     Plaintiff has hired counsel that is skilled and experienced in class actions and are adequate class counsel capable of protecting the interests of the Class Members.

83.     Common questions of law and fact predominate over questions affecting only individual Class Members, and a class action is the superior method for fair and efficient adjudication of this controversy.

84.     The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

## CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF THE NORTH CAROLINA DEBT COLLECTION ACT**
**N.C. Gen. Stat. § 75-55(2)**
**On Behalf of Plaintiff Bell and the Class**

85.     All prior and subsequent paragraphs are hereby incorporated by reference.

86.     Plaintiff and the Class Members engaged in consumer transactions when they took out mortgages in order to acquire real property for personal, family, or household uses. Plaintiff took out the mortgage loan secured by her property and now serviced by SPS for personal, family, or household uses. *See* N.C. Gen. Stat. § 75-50(1).

87.     The NCDCA defines "debt collector" as "any person engaging, directly or indirectly, in debt collection from a consumer. N.C. Gen. Stat. § 75-50(3). The NCDCA applies to SPS because they attempt to collect alleged debts arising out of consumer transactions, when they collect a debt associated with consumer mortgages.

88.     N.C. Gen. Stat. § 75-55(2) prohibits SPS from collecting any part of its fee or charge for services rendered. SPS violated this provision of the NCDCA as to Plaintiff

21

and the Class when it collected Pay-to-Pay Fees when borrowers paid their mortgages online, over the phone, and/or using an Interactive Voice Response system ("IVR") , as the Pay-to-Pay Fees represent a charge for services rendered and/or SPS's fee.

89.     N.C. Gen. Stat. § 75-55(2) further prohibits SPS from collecting a "any interest or other charge, fee or expense incidental to the principal debt unless legally entitled to such fee or charge." SPS violated this provision of the NCDCA as to Plaintiff and the Class when it collected Pay-to-Pay Fees when borrowers paid their mortgage online and/or over the phone, as the Pay-to-Pay Fees are a "charge, fee or expense" incidental to the mortgage debt and related payment, and SPS was not legally entitled to such fee or charge.

90.     SPS knew that the Mortgage Agreements of Plaintiff and the Class Members did not expressly authorize SPS to collect Pay-to-Pay Fees, and that SPS did not have a right to collect the fees or charges they paid to third parties, such as Western Union, for Pay-to-Pay services rendered. SPS also knew that the Pay-to-Pay Fees charged were unauthorized charges, fees, or expenses that were incidental to the underlying debt. SPS knew that it was collecting more than the cost to process the Pay-to-Pay Transactions when it collected the Pay-to-Pay Fees. Despite this knowledge, SPS represented to Plaintiff and the Class Members that they had the right to collect Pay-to-Pay Fees and collected them from Plaintiff and the Class Members.

91.     As a result of SPS's violations of the NCDCA, Plaintiff and Class Members were harmed. They are entitled to actual damages, plus statutory damages of not less than

22

five hundred dollars ($500.00) nor greater than four thousand dollars ($4,000) for each violation of N.C. Gen. Stat. § 75-56, as well as reasonable attorneys' fees and costs.

## COUNT II

**VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**N.C. Gen. Stat. §75-1.1**
**On Behalf of Plaintiff Bell and the North Carolina Class**

92.     All prior and subsequent paragraphs are hereby incorporated by reference.

93.     SPS engaged in "commerce" as defined by N.C. Gen. Stat. § 75-1.1 when it attempted to collect, and collected, a debt associated with mortgage payments.

94.     SPS violated the NCUDTPA under N.C. Gen. Stat. § 75-1.1 when it engaged in unlawful, unfair, and deceptive practices in trade or commerce by taking advantage of consumers in claiming and collecting amounts not owed.

95.     SPS violated the NCUDTPA's prohibition on deceptive practices, as SPS never informed Plaintiff that (1) the actual cost to SPS for Pay-to-Pay Transactions was less than the amount charged to Plaintiff and (2) the collection of Pay-to-Pay Fees was not allowed under her deed of trust.

96.     SPS violated the NCUDTPA's prohibition on unfair practices because its Pay-to-Pay Fees offend public policy, are immoral, unethical, oppressive, or unscrupulous, and/or cause substantial injury to consumers.

97.     SPS's use of its exclusive position as the mortgage servicer for captive borrowers like Plaintiff and Class to impose Pay-to-Pay Fees to which it is neither entitled by law to add nor expressly authorized by the Uniform Mortgages constitutes a "unfair"

23

business practice because, as alleged above, it offends established federal and state public policy, is immoral, unethical, oppressive, or unscrupulous, and have resulted in substantial injuries to consumes.

98.    The State of North Carolina's actions in various contexts demonstrate that Pay-to-Pay Fees offend established public policy. For example, Attorney General Stein has condemned such fees as illegal and unfair on various occasions. And the state has enacted laws such as the NCDCA, which prohibits debt collectors from collecting portions of their fees. Federal public policy also disfavors Pay-to-Pay Fees. This policy is reflected in, among other things, CFPB statements and advisory opinions, the statements of the executive branch, and Congress's prohibition in the FDCPA on debt collectors assessing Pay-to-Pay Fees.

99.    Conduct is oppressive when it leaves a consumer with little alternative except to submit to it, and the consumer cannot avoid the defendant's practice by seeking an alternative elsewhere. SPS's conduct is oppressive because borrowers cannot choose another loan servicer or shop around for a better deal to avoid its imposition of unlawful Pay-to-Pay Fees. Borrowers are forced to have SPS as their loan servicer as a result of the unilateral decision of their lender or holder of their note. If Plaintiff and Class Members had their choice, they would select one of the many other mortgage servicers that do not charge a fee for a standard telephonic payment.

100.    SPS's unfair practices are substantially injurious to consumers, who were and are forced to pay these Pay-to-Pay Fees each time they make payments by phone. In

aggregate, the charging of these illegal fees has resulted in millions of dollars of harm to North Carolina borrowers.

101.    There are no countervailing benefits to consumers or competition that outweighs the harm suffered by Plaintiff and the Class. SPS charges fees well above the actual cost of providing online and phone payment services and doing so gives SPS an unfair advantage over its competitors who do not charge the unlawful fees. If SPS could not charge Pay-to-Pay Fees, it would still offer to consumers the option to pay by phone and/or online, as the costs to SPS are significantly cheaper than processing a check payment. The unlawful profit center gives SPS the opportunity to undercut its competitors by accepting a lower servicing fee, providing more robust services for the same servicing fee, distributing more dividends to its shareholders, or any combination thereof. This will incentivize competitors to engage in a race to the bottom to reduce costs – likely in the form of the reducing the number of employees or decreasing or delaying technological investment—or increase their revenue by instituting their own unlawful fees. Either scenario, or combination thereof, is detrimental to consumers and competition.

102.    SPS violated the NCUDTPA's prohibition on illegal practices, as SPS violated the NCDCA, as set forth in Count I. The NCDCA was enacted to prohibit unfair and deceptive acts within the debt collection and servicing industries. Thus, by violating the NCDCA, there is a per se violation of the NCUDTPA.

103.    As a result of SPS's NCUDTPA violations, Plaintiff and the Class suffered substantial damage, including but not limited to financial damage incurred from SPS's unlawful Pay-to-Pay Fees.

104.    To the extent necessary, this cause of action is pled in the alternative.

## DEMAND FOR RELIEF

Plaintiff demands from SPS on her behalf and on behalf of all those similarly situated:

1.    An order certifying the proposed Class pursuant to Federal Rule of Civil Procedure 23 and appointing Plaintiff and her counsel to represent her;

2.    Monetary and/or equitable relief in an amount to be determined at trial;

3.    Statutory damages and/or penalties, including treble damages;

4.    Punitive or exemplary damages;

5.    Pre- and post-judgment interest to the extent provided by law;

6.    Attorneys' fees and costs of suit, including costs of notice, administration, and expert fees; and

7.    Such other legal or equitable relief, including injunctive or declaratory relief, as the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 19, 2024            Respectfully submitted,

                        _/s/ Benjamin M. Sheridan_
                        Benjamin M. Sheridan (NC Bar #52734)
                        Jed R Nolan (NC Bar #56899)
                        **KLEIN & SHERIDAN, LC PC**
                        964 High House Rd. PMB 2039
                        Cary, NC  27513
                        (304) 562-7111
                        ben@kleinsheridan.com
                        jed@kleinsheridan.com

26

James L. Kauffman
**BAILEY & GLASSER, LLP**
1055 Thomas Jefferson Street, NW
Suite 540
Washington, DC 20007
(202) 463-2101
jkauffman@baileyglasser.com

Bart D. Cohen
**BAILEY & GLASSER, LLP**
1622 Locust Street
Philadelphia, PA 19103
(215) 274-9420
bcohen@baileyglasser.com

Katherine M. Aizpuru
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Ave., NW
Suite 1010
Washington, DC 20006
(202) 973-0900
kaizpuru@tzlegal.com

*Counsel for Plaintiff and the Proposed Class*

27